170 N.J. Super. 64 (1979)
405 A.2d 487
CONFORTI & EISELE, INC., A NEW YORK CORPORATION AUTHORIZED TO DO BUSINESS IN NEW JERSEY, PLAINTIFF,
v.
THE DIVISION OF BUILDING AND CONSTRUCTION, DEPARTMENT OF THE TREASURY, STATE OF NEW JERSEY, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
June 25, 1979.
*65 Mr. Edward J. Frisch for plaintiff (Messrs. Lindabury, McCormick & Estabrook, attorneys).
*66 Mr. Lawrence Moncher Deputy Attorney General, for defendant (Mr. John J. Degnan, Attorney General, attorney; Mr. Jeffrey W. Jones, Deputy Attorney General, on the brief).
MARZULLI, J.S.C.
Conforti & Eisele, a general contractor, was the successful bidder on certain phases of the construction of the New Jersey College of Medicine and Dentistry. The State Division of Building and Construction (hereinafter referred to as the State) divided the construction work into five phases. Conforti & Eisele (hereinafter Conforti was awarded the contracts for phrases III and V. The contracts were performed with difficulties and delays which ripened into a lawsuit filed by Conforti against the State and others. The basic issue to be litigated at that trial is to determine which party was legally responsible for the "extras" and other items of damage Conforti alleges it suffered.
Since the suit involves highly technical matters in the fields of civil engineering and construction, each party has endeavored to retain an expert to analyze the merits of its legal position and issue an expert report. Conforti retained Hill International, Inc. (Hill) as an expert to aid it in the litigation involving phases III and V. The State, for the reasons set out below, moves to bar Conforti from utilizing Hill as an expert for the phase III and V litigation.
The State's position is that since it had previously retained Hill on phase II, another phase of the construction of the College of Medicine and Dentistry, Conforti should now be enjoined from employing Hill for these two phases of the same project. This injunction is necessary, the State contends, to protect confidential communications made by representatives of the State to Hill before and during the time Hill was employed as the State's expert on phase II.
A hearing was held to determine the propriety of granting what can only be referred to as a unique remedy for an unusual problem.
*67 In making this decision, I must balance two important interests. On the one hand, there is Hill's right to pursue its professional calling and the economic hardship it would suffer if I were to deny Hill its business relationship with Conforti. On the other hand, there exists the strong potential of a conflict of interest and the likelihood the State will suffer by having its confidences revealed to its adversary. Since there is no assertion that without Hill plaintiff is deprived of the use of an expert, Conforti's interest is comparatively weak.
There are two prongs to the State's argument: the attorney-client privilege and fundamental fairness. Each will be discussed separately below.
The attorney-client privilege, set out in N.J.S.A. 2A:84A-20, protects not only communications between an attorney and his client but also extends to communications made to any agent of the attorney. Applying the privilege to the present action, the State contends Hill was an agent of its attorney when Hill was engaged as an expert consultant for phase II. Before, during and after this relationship between Hill and the State, the State's attorney imparted confidences to Hill and the State permitted Hill free access to its files. Since Hill was the State's expert, both the State and its attorney felt confident that they could confide in Hill without fear that Hill would in any way misuse this information. Now that Hill is retained by Conforti, the State's adversary in phases III and V, the State argues the attorney-client privilege should be employed in such a way as to prevent any possible disclosures by Hill to Conforti of any confidences imparted to Hill by the State or its legal counsel.
Conforti argues that even if the attorney-client privilege applies to shield communications with regard to phase II between July and August 1978, the privilege should not extend to phases III and V, the only two phases involved in this lawsuit. Conforti also argues that the privilege should not extend to any communication made before July 1978 or after August 1978, *68 since Hill's employment by the State on phase II existed only for that short period. Finally, Conforti contends the privilege should protect only those communications made by representatives of the State, and not those made by the State's attorney.
I make the following factual findings:
1. Hill International, Inc., holds itself out as a firm of experts providing litigants with opinions and reports relating to all phases of construction work. Their expertise includes legal, accounting, engineering, architectural and many other facets of construction work. The purpose of providing these services is to assist its clients' legal staff.
2. The relationship between Hill and the State developed over a period of time. It began at a conference in April 1978 where Mr. Richter, vice-president of Hill, was a lecturer. Deputy Attorney General Eugene Sullivan attended the conference and was impressed by Richter's expertise. Shortly after the conference Sullivan contacted Richter and asked him if Hill would act as a consultant for litigation involving phase II. Although at that time Sullivan was interested in retaining Hill for phase II only, phases III and V were also discussed.
3. Approximately one month after that initial meeting, a second meeting was held between representatives of Hill and Sullivan. At that meeting Sullivan discussed with Hill's representatives the various strengths and weaknesses of the State's case in phases III and V. A substantial amount of trial strategy was also aired at that meeting by both Hill's representatives and Sullivan in an attempt to solidify the State's legal position with regard to phases III and V.
4. Before being hired on phase II, Hill was given an opportunity to review the State's entire file, not only on phase II but on phases III and V as well. In addition, copies of the pleadings and administrative decisions for phases III and V were made available.
5. Several months later, in July 1978, the State retained Hill on phase II as a trial consultant and expert witness. Hill filed *69 its final report on phase II and in August 1978 phase II was decided. Thereafter, since the State was still involved in phases III and V, the possibility of retaining Hill for those two phases as well was still entertained.
6. The parties continued in this position up until January 1979, when for reasons unrelated to this lawsuit the State decided it no longer desired to retain Hill.
7. Testimony at the hearing revealed that until this decision was made, conversations between the State and Hill continued and representatives of the State discussed trial tactics for the phase III and V litigation with Hill.
The applicability of the attorney-client privilege depends upon whether or not Hill ever acted as an agent for the State's attorney, the duration of that agency and whether or not confidential communications regarding phases III and V were made during that period.
Although there are no New Jersey cases which hold that an engineering firm is an agent for the purpose of applying the attorney-client privilege, the privilege has been extended to other agents acting on behalf of an attorney. State v. Kociolek, 23 N.J. 400 (1957) (privilege extended to communication between defendant and psychiatrist engaged by his attorney to examine him); State v. Tapia, 113 N.J. Super. 322 (App.Div. 1971) (privilege extended to investigator for Public Defender's Office). Certainly the policy behind extending the attorney-client privilege to an agent of the attorney should apply regardless of the capacity in which the agent acts. The policy behind the privilege is to promote full and free discussion between a client, his attorney and the attorney's agents in order to prepare one's case. Kociolek, supra. To further that policy, the privilege should enable a client to take appropriate action to protect such discussions from disclosure to his adversary.
In Wilson v. Superior Court, 148 Cal. App.2d 433, 307 P.2d 37 (D.Ct. 1957), a defendant engineering firm had at one time been employed by a codefendant as an expert to investigate the cause *70 of a landslide which was the subject of a law suit filed against it. A representative of the engineering firm refused to answer certain questions propounded at his deposition by plaintiff, whereupon plaintiff moved to compel him to answer. The court held that since defendant had been hired by his codefendant as an engineering expert, he was the agent of his codefendant's attorney. Therefore he was not required to reveal the contents of any communications that took place between him and counsel for his co-defendant.
Hill became an agent for the State's attorney when it was hired for litigation involving phase II. Therefore any confidences revealed between July 1978 and August 1978, when phase II was decided, are protected by the attorney-client privilege.
There is case law in support of extending the privilege beyond that limited time frame. In State v. Loponio, 85 N.J.L. 357 (E. & A. 1913), the issue was the admissibility of a letter written by a defendant in jail to an attorney for the purpose of employing him in his defense. Since defendant spoke no English he used an interpreter to translate the English for him. The Court of Errors and Appeals said the trial judge should not have permitted defendant's interpreter to testify because of the attorney-client privilege. The fact that the attorney had declined to represent defendant made no difference to the Loponio court:
It is immaterial that the lawyer had not been previously employed. A letter for the purpose of employing and intended to employ and instruct an attorney is protected to the same extent as one of instruction after the employment had taken place, and this although the lawyer subsequently refuse the employment. But there must be an intention to employ. [at 363]
Therefore, even though Hill was not retained until July 1978, any confidential communications regarding phase III and V made when the State was contemplating hiring Hill are protected to the same extent as those made during the period of actual retention. By the same token, although Hill's services for phase *71 II ended in August 1978, Hill continued to be consulted with regard to phases III and V until January 1979, even though never formerly retained as an expert for those phases. Any confidences revealed by the State during this period should likewise be equally protected to the same extent as those made during the period of actual employment on phase II, since there was an intention to employ. Loponio, supra.
As to Conforti's contention that the privilege should not apply to communications made by an attorney, as opposed to those made by a client to the attorney's agent, the answer lies again in the policy behind the privilege. It would be anomalous to hold that the State could claim the privilege as against its attorneys, yet have that privilege dissolve when their attorneys properly confide their client's communication to someone in their employ. The client is the holder of the privilege and should be entitled to demand the silence of any party in his employ who could disclose what he revealed in confidence. As is stated in State v. Kociolek, supra:
The privilege extends to the necessary intermediaries and agents through whom the communications are made. And it includes communications between the attorney and a scientific expert retained to aid in the presentation of the defense, a confidential employment. [23 N.J. at 413]
Kociolek is cited as representative of the general principle that technical consultants cannot disclose information received in confidence in connection with the rendition of legal advice in Annotation, 96 A.L.R.2d 125, 148 (1964).
Further support for the applicability of the attorney-client privilege can be gleaned by reference to Disciplinary Rule 4-101. DR4-101 sets forth an attorney's obligation with respect to confidences revealed by his client. The plain purpose of the rule is to require all attorneys not to reveal the confidences of their clients. To implement this salutary purpose, section (D) of the rule goes so far as to impose a duty to exercise reasonable care not to have these confidences revealed:

*72 A lawyer shall exercise reasonable care to prevent his employees, associates, and others whose services are utilized by him from disclosing or using confidences or secrets of a client.
The State's motion in the present case is aimed at upholding this duty of reasonable care. The attorneys for the State, knowing they imparted to Hill its client's confidences, seek merely to uphold this duty by taking reasonable care to prevent their disclosure.
In addition to the attorney-client privilege, I feel compelled to restrain Conforti's use of Hill on the ground that it would be fundamentally unfair to the State to permit such a situation to occur. In the analogous field of trade secrets, courts do not hesitate to enjoin employees who would divulge trade secrets to the disadvantage of their former employer. See, e.g., Sun Dial Corp. v. Rideout, 16 N.J. 252 (1954). Just as a former employee should be prevented from disclosing that which took time and expertise to develop, so too should a litigant be prevented from reaping similar benefits within the context of a lawsuit. In response to Conforti's argument that the court is depriving Hill of a living, I borrow from Sun Dial to quote Justice Jacobs' cogent balancing of competing interests:
But there is also a policy which is designed to protect employers against improper disclosures of information which their employees have received in confidence and this policy may perhaps be receiving increased recognition in the light of the marked changes in the attitude of the law toward the need for commercial morality.... Our judicial decisions have faithfully sought to vindicate both policies by preserving to employees their unfettered right to leave their employment and use elsewhere their acquired skill and knowledge of the trade generally as distinguished, however, from any trade secrets imparted to them in confidence and which they must continue to honor as such. [at 260-61]
So, too, can Hill offer its services to anyone it pleases, with the exception of offering them to Conforti in this particular litigation.
The argument in favor of an injunction is no less compelling despite the lack of a formal retention of Hill by the State as an *73 expert for phases III and V. The law will imply a relationship of confidence when it is just to do so. See, e.g., International Industries Inc. v. Warren Petroleum Corp., 99 F. Supp. 907 (D.Del. 1951), aff'd in part, rev'd in part (as to measure of damages) 248 F.2d 696 (3 Cir.1957), cert. den. 355 U.S. 943, 78 S.Ct. 529, 2 L.Ed.2d 523, where the court held the details of a tanker design were entitled to equitable protection from disclosure, even though the design was revealed to defendant during a negotiation which ultimately proved unsuccessful. Protection of the designs was afforded because they were disclosed "under conditions which created a relationship of confidence." 99 F. Supp. 912, 913. So, too, in the present case.
As mentioned earlier, Hill was privy to confidential documents regarding the legal aspects of the State's claims, as well as the mental impressions, opinions and legal theories of the State's counsel. Even if this information was not disclosed to Conforti per se, Conforti would still obtain the benefit of this confidential information because it would shape or effect, either consciously or unconsciously, the report Hill will render to Conforti. The very nature of the services which Hill provides makes it impossible to conceive of a situation in which Hill could conscientiously discharge its duty to Conforti as an expert while simultaneously discharging its duty to the State of New Jersey not to divulge confidences and secrets which the State has conveyed to Hill. Thus, to permit Conforti to hire Hill as an expert would enable plaintiffs to obtain indirectly that which they clearly are not permitted to achieve through discovery. No form of protection order could be truly effective in expunging this knowledge from Hill's mind. The only conceivable means of protecting the State's interest in this instance is to simply preclude Conforti from employing Hill as an expert with respect to this litigation.
In issuing such an injunction, the court is mindful of the necessity of limiting the application of its decision solely to those cases where an injunction is justified. This decision should in no *74 way be read to indicate that an expert who has traditionally been hired by one attorney in a particular type of litigation would be precluded from offering his services to that particular attorney's adversary in an unrelated matter. This would be both unintended and undesirable since in the ordinary situation an expert can remain fully loyal to his client without affecting the rights of other clients. Here, however, the court has been presented with a rather unique situation. Although Hill was hired by the State only on phase II, it gained access to the State's files and became privy to the State's attorney's views on phases III and V as well. Although each phase represented the construction of different buildings of the college, the fact remains that all phases were interrelated. Under these circumstances, the potential abuse of its former client's confidences and Hill's own inability to render Conforti an objective expert report make Hill's further employment by Conforti both legally and morally impossible.
For the foregoing reasons, the State's motion to enjoin Conforti from utilizing Hill as an expert is granted.